# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **ELBERT SMITH,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:17CV00215 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **DENNIS COLLINS, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Elbert Smith, Pro Se Plaintiff; Laura H. Cahill, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Elbert Smith, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 and was granted permission to proceed without prepayment of filing fees. 28 U.S.C. § 1915(b). In his Complaint as amended, Smith alleges that prison officials have housed him in segregated confinement under highly restrictive conditions since 2011 without due process, in violation of his rights under the Fourteenth Amendment. After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

## I. BACKGROUND.

Smith was received into Virginia Department of Corrections ("VDOC") custody on November 14, 1996, and is serving a 44-year sentence for various

convictions, including two counts of malicious wounding, second-degree murder, use of a firearm in the commission of a felony, and distribution of cocaine.[1] In November 2010, Smith was assigned to the Grooming Policy Violators Housing Unit ("VHU") at Keen Mountain Correctional Center.[2] In February 2011, Keen Mountain administrators transferred Smith on an emergency basis to Red Onion State Prison ("Red Onion"), a higher security facility, after he was accused of assaulting a correctional officer. State court criminal charges based on his conduct were ultimately dismissed or reduced. Nevertheless, based on the assaultive behavior, Smith was held in segregated confinement and was ultimately assigned to the VDOC's security Level S.

Level S is a security classification reserved for inmates who must be managed in a segregation setting because allowing them to interact freely with other inmates or with staff would pose an unjustifiable security risk. Certain kinds of past acts are segregation qualifiers. For example, committing an aggravated assault on staff, committing an aggravated assault on another inmate with a

---

[1] The facts, stated in the light most favorable to Smith, are taken from his submissions, ECF Nos. 1, 10, 32, and 38, documents and interrogatory responses that the defendants filed, ECF Nos. 34 and 36, and the affidavit of the warden of Red Onion State Prison and its attached policies, ECF No. 27.

[2] In response to the defendants' motion, Smith states that he does not cut his hair because of his Rastafarian religious beliefs. VDOC grooming procedures require inmates to keep their hair no longer than one inch or be housed in a segregated housing assignment, and the VHU is such an assignment. *See* Mem. Supp. Mot. Summ. J. Ex. 3, VDOC Operating Procedure 864.1, ECF No. 27-3.

weapon or resulting in a serious injury without a weapon, participating in violent gang-related activity, or committing other acts posing a "threat level too great for the safety and security of a lower level institution are segregation qualifiers." Mem. Supp. Mot. Summ. J. Ex. 2, VDOC Operating Procedure ("OP") 830.2(IV)(G)(2), ECF No. 27-2.

A Level S inmate may participate in the Segregation Reduction Step-Down Program ("Step-Down Program"), which took effect in February 2013. It is designed to help inmates progress in stages toward a return to the general prison population setting in a manner that maintains public, staff, and inmate safety. *Id.* at Ex. 1, Mathena Aff., Enclosure A, OP 830.A, ECF No. 27-1. The program is an incentive-based, goal-oriented housing system currently in place at Red Onion. Until October 2017, a modified version of the program operated at Wallens Ridge State Prison ("Wallens Ridge"). In this program, when inmates consistently exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges.

A newly classified Level S inmate is assessed and assigned to one of two pathways, each with specified privilege levels: intensive management ("IM") or special management ("SM"). An inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . .

fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." *Id*. at OP 830.A(III). Smith's 2011 aggravated assault against a staff member was a factor in his assignment to Level S and the SM Step-Down Program pathway.

Inmates on the SM pathway are further sub-classified under OP 830.A, starting with the SM-0 step, the most restrictive status, and working toward the general prison population as the least restrictive, as follows: SM-0, SM-1, SM-2, SM-SL6, Step-Down—Level VI General Population, Structured Living—Phase 1 and Phase 2, Security Level V General Population. The aim of these privilege stages is to motivate inmates to participate in the Step-Down Program, which is designed to help them make cognitive changes toward pro-social behavior. An inmate who chooses to participate in the program faces three areas of commitment: disciplinary goals, responsible behavior goals, and programming participation goals, including completion of designated portions of the seven workbooks in the *Challenge Series*. The program is designed to develop a routine pattern of responsible and mature conduct. Inmates strive to earn good weekly behavior ratings in cell maintenance, personal hygiene, standing for count, respect, and programming participation. When evaluators determine that an inmate has met the goals designated for a step, they may advance him to the next step and the

additional privileges assigned to it. Inmates who do not meet goals in these areas can be moved back a step or be required to start over with a *Challenge Series* workbook.

All Level S inmates are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells. They receive the same types of meals that inmates in general population receive (but in their cells), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates are permitted a limited number of phone calls per month, one non-contact visit each week, and limited commissary purchases. They can possess and exchange library books each week, receive and send mail, and possess legal and religious materials. An inmate who moves from SM-0 to SM-1 or SM-2 is permitted additional privileges.

Smith complains that living conditions under the Step-Down Program are harsh. Mot. File Am. Compl. 3-4, ECF No. 10. He must undergo a visual strip search whenever he leaves his cell. The cells have no mirrors, and the lights are never turned off, only dimmed from 10:00 p.m. to 5:00 a.m. Cell doors are solid metal, with strips along the sides and bottom to minimize communication with inmates in nearby cells. Use of the device that inmates use to send and receive emails is limited. Smith says that Step-Down Program cells are "synonymous with

extreme isolation, in contrast to any other Virginia prison." *Id.* at 4. He states that he has been "deprived of almost any environmental or sensory stimuli" and "hasn't touched or smelt [sic] grass nor taken more than five steps without restraints in four (4) years, and [has been] restricted to [one] hour of fresh air" during limited recreation periods. *Id.*

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress in the Step-Down Program toward the goals of his assigned step. Team members are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. OP 830.A(IV)(D), ECF No. 27-1. Under the procedures in OP 830.A, staff evaluators regularly reassess each inmate's progress toward consistently meeting these goals — during informal weekly reviews and more formal assessments every 90 days and annually. Per policy, a formal review includes advance notice to the inmate, an opportunity for him to make a statement, and a written report of the evaluator's classification recommendation and reasons for it.

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6 Phase 1. *Id.* at OP 830.A(IV)(F). The phases of SM-SL6 are geared to safely reintroduce an inmate into a social

environment where he can interact with other inmates in gradually increased amounts of time and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. An SM-SL6, Phase 1 inmate will start with unrestrained movement from his cell to the shower or recreation, then to participation in the *Thinking for a Change* curriculum with a few other inmates, and then, in Phase 2, to having a cell mate, outside recreation time, and meals in the dining hall with other inmates.

Smith entered an earlier version of the Step-Down Program at Red Onion in 2012. Administrators there allegedly led Smith to believe that if he completed the steps in the program, he could be returned to the VHU. In April of 2013, after Smith had been in segregated confinement for two years, an Institutional Classification Authority ("ICA") formally recommended Level S status for him. Smith completed the *Challenge Series* in July 2013 and was transferred to Wallens Ridge, hoping for VHU placement there. Instead, Smith spent the next four years in the Step-Down Program. Repeatedly, after his ninety-day status review before the ICA, Counselor Anthony Gilbert's reports recommended a longer period of stable adjustment for Smith. It is undisputed, however, that Gilbert also spoke personally with Smith many times about the Step-Down Program process. Gilbert Answer Interrog., ECF No. 36.

Smith has presented evidence that during his years in the Step-Down Program, he has earned an increase in his rating for earning good conduct time and a decrease in his security level points. Nevertheless, he was sometimes held at the same step or was moved back a step for "being out of compliance with grooming policy," Mot. Opp'n Mot. Summ. J. Smith Aff. Ex. G, ECF No. 32-4, even though he had been noncompliant since before being transferred to segregation in February 2011.

On February 1, 2016, during an ICA review with Gilbert, Smith asked, "What do I need to do to get a pathway?" Compl. ¶ 25, ECF No. 1. Collins recommended that Smith needed a longer period of stable adjustment and then approved his own recommendation, in violation of OP 830.A. When Smith grieved this review process, Wallens Ridge Warden Leslie Fleming ruled that Smith's grievance was well founded, and VDOC Western Regional Administrator Marcus Elam upheld that finding on appeal, but neither of these officials assisted Smith in the Step Down process.

In July 2016, Smith asked to join a class of inmates in the *Thinking for a Change* Series to progress toward a transfer out of segregation. Collins refused his request. On July 25, 2016, at another review, Smith repeated his desire to move to the VHU. Lieutenant Richard Light recommended against this move, based on his finding that Smith needed a longer period of stable adjustment and was not in

compliance with grooming requirements. Light then approved his own recommendation, in violation of policy. Smith filed a grievance, Fleming ruled that his contention of a procedural violation was well founded, and Elam upheld that ruling. Neither of these officials addressed Smith's claim that Gilbert and Light were blocking his progress through the Step-Down Program, leaving him trapped in segregation and unable to earn a transfer back to the VHU.

Smith filed this § 1983 Complaint in May 2017 against Fleming (now Red Onion's Warden), Collins, Light, Gilbert, and Elam, alleging a violation of due process, and he subsequently amended to add a second due process claim.[3] Liberally construed, Smith contends that (1) he was inappropriately assigned to Level S without due process, and (2) the defendants' actions that kept him in segregation for four years under the Step-Down Program deprived him of a protected liberty interest without due process.[4] He seeks monetary and injunctive relief.

---

[3] In his amendment to the Complaint, Smith also alleges that defendants Fleming and Elam used continued administrative segregation to retaliate against him for his 2011 assault on staff. *See* Mot. File Am. Compl. 4, ECF 10. He does not indicate that he wishes to add a separate claim of retaliation, however. Moreover, such conclusory allegations of retaliation are not sufficient to state any actionable claim under § 1983. *See Adams v. Rice*, 40 F.3d 72, 74-75 (4th Cir. 1994).

[4] Smith keeps his hair uncut because of his Rastafarian religious beliefs, which he first mentioned in his response to the defendants' Motion for Summary Judgment. His response also complained about his mental health problems, strip search procedures, and allegedly smaller portions of food he received in segregation. His Complaint, as amended, did not assert any legal claim about these issues. Smith also has not alleged

With their motion, the defendants provide evidence about events subsequent to the filing of the Complaint. In October 2017, all Level S inmates (including Smith) were transferred from Wallens Ridge to Red Onion and continued the Step-Down Program there. At that time, Smith was at SM-0 status due to poor hygiene scores. In November 2017, however, he was advanced to SM-2. Defendants' evidence has indicated that the ICA would continue to assess Smith's progress in the Step-Down Program and after his successful completion of SM-SL6 Phase 1 and Phase 2, he would be considered for placement in the VHU at Wallens Ridge. By January 2018, he was working his way through SL6 Phase 1, and in May 2018, Smith notified the court that he had been transferred to Wallens Ridge.

## II. DISCUSSION.

### A. Summary Judgment Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

that the named defendants deprived him of his right to free exercise of his religious beliefs, denied him adequate mental health treatment, or imposed unconstitutional living conditions. Therefore, I do not consider any such claims to be before the court in this case. *See Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (holding that the plaintiff could not raise in his response to defendants' summary judgment motion a claim different from those presented in his complaint).

In short, a motion for summary judgment should be granted when the proof, taken in the form admissible at trial and resolving all factual doubts in favor of the nonmoving party, would lead a reasonable juror to but one conclusion. *Id.* at 247-52. I must "view the facts and draw reasonable inferences in a light most favorable" to Smith, as the nonmoving party, and presume that his evidence is credible. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, he "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."[5] *Anderson*, 477 U.S. at 248.

B. Statute of Limitations.

Smith's first claim contends that his segregated confinement at Red Onion and Wallens Ridge in 2011 and 2012 and his initial assignment to Level S in April 2013 occurred without due process. This claim is barred by the applicable statute of limitations.

Section 1983 cases adopt the statute of limitations governing general personal injury actions in the state where the tort allegedly occurred. *See Owens v. Okure*, 488 U.S. 235, 239-41, 250 (1989). In Virginia, the limitations period for general personal injury claims is two years. *See* Va. Code Ann. § 8.01-243(A). It is well established that "a cause of action [under § 1983] accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable

---

[5] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995).

Smith clearly knew of his classification to Level S at the time it occurred in April 2013. Therefore, he had two years from the date when his § 1983 claims accrued to file them in a federal lawsuit. *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011). Smith did not sign and date his § 1983 Complaint until May 8, 2017, well outside the two-year filing limit in Va. Code Ann. § 8.01-243(A). He also did not offer any reason for failing to file his claims about that event sooner. Accordingly, I will summarily dismiss Smith's Claim (1) as time barred.[6]

### B. Due Process Regarding the Step-Down Program.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v.*

---

[6] The defendants have not sought dismissal of this claim under the statute of limitations. Rather, they construed Smith's amendment (ECF No. 10) as focusing his claims only on his experiences in the Step-Down Program. Smith has clarified in other submissions that he intended to pursue both claims. Because the untimeliness of Claim (1) is clear from the facts in the Complaint, however, I may lawfully dismiss the claim, sua sponte, under 28 U.S.C. § 1915(e)(2)(b), as frivolous. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656-57 (4th Cir. 2006) (recognizing that where lawsuit is filed under 28 U.S.C. § 1915 without prepayment of filing fees, court has authority to sua sponte dismiss time-barred claims as frivolous under § 1915(e)(2)).

*Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

As a convicted prisoner, Smith does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Smith (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the Step-Down Program, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Absent evidence to the contrary here, the "ordinary incidents of prison life" for Smith are the conditions of general population status. *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016). Only if Smith makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *See Sandin*, 515 U.S. at 484.

I conclude that Smith has a state-created liberty interest. Policy provides that at least every ninety days, officials will review each Level S inmate — including those participating in the Step-Down Program — to determine whether his current

segregation status remains appropriate or should be adjusted. *See* OP 830.A(IV)(K), ECF No. 27-1; *Incumaa*, 791 F.3d at 527 (finding that state prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Smith's continued confinement in the various segregation classifications within the OP 830.A categories has imposed "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates . . . fall within the expected perimeters of the sentence imposed by a court of law. *See Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently").

Without question, VDOC inmates classified to the SM pathway are confined under highly restrictive conditions, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside

the cell only in full restraints and with dual escorts, after a visual strip search. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (six months).

And in many other ways, living conditions in SM status approximate conditions for general population inmates. Inmates in this status have access to hygiene and legal materials, telephone usage, legal counsel, medical and mental health care, library books, commissary items, ingoing and outgoing mail services, and the grievance procedure. They may possess property items, including religious materials, in their cells, and they receive regular meals, laundry services, and visitation opportunities.

This court has repeatedly found that an inmate's confinement at Red Onion under the Step-Down Program in OP 830.A is not atypical and significantly harsh as contemplated under *Sandin*. *See, e.g., Jordan v. Virginia Dep't Corr.*, No. 7:16CV00228, 2017 WL 4127905, at *8 (W.D. Va. Sept. 18, 2017); *Wali Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225, at *2 (W.D. Va. Jan. 27, 2017); *Obataiye-Allah v. Virginia Dep't of Corr.*, No. 7:15CV00230, 2016 WL 5415906, at *9 (W.D. Va. Sept. 28, 2016), *aff'd*, 688 F. App'x 211 (4th Cir. 2017)

(unpublished). "Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections." *Obataiye-Allah*, 2016 WL 5415906, at *10.

The evidence here does not support a finding that Smith was subjected to the sort of prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns in *Wilkinson. See Wilkinson,* 545 U.S. at 214 (noting that supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact . . . for an indefinite period of time"). Unlike the segregation systems in *Wilkinson* and *Incumaa*, OP 830.A requires staff to conduct frequent and detailed reviews of each Level S inmate's status and communicate with him about those reviews and his progress. Privilege levels are informally reviewed weekly and formally reviewed every three months. The procedures define clearly what actions an inmate must take to be considered for status changes: participating in the required programming, improving behavior, and remaining infraction free. While the policy recognizes that some inmates' assaultive history or other factors will require lengthy terms in some form of segregated confinement, the procedure informs the inmate of choices and changes he can make to progress toward less restrictive conditions.

One of Smith's primary contentions is that his refusal to comply with grooming standards was often cited when he was denied progress in the Step-Down Program. The cited grooming policy, however, "is the same grooming policy applicable to inmates in general population; consequently, it cannot be 'atypical.'"[7] *Barksdale v. Clarke*, No. 7:16-CV-00355, 2017 WL 3381370, at *6 (W.D. Va. Aug. 4, 2017) (citing *Beverati*, 120 F.3d at 527-28).

For the reasons stated, I find no material fact in dispute on which Smith can establish that his confinement at Red Onion or Wallens Ridge under OP 830.A has been atypical and significantly harsh compared to conditions contemplated by his sentence. As such, he cannot show that he had a constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A or that any particular procedural protection was constitutionally required during the OP 830.A classification proceedings. *See Sandin*, 515 U.S. at 486-87.

Smith also has no viable claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures or other VDOC policies. Smith complains about delays in classification reviews; about the same official making and approving recommended classification decisions or giving repetitive, unhelpful reasons for lack of progress; and about being no longer a threat to

---

[7] Moreover, the so-called grooming policy, OP 864.1, includes standards for not only inmates' hair length, but also their personal hygiene — for example, requiring them to keep "themselves and their hair clean and neat in appearance," OP 864.1(IV)(C)(1), ECF No. 27-3, and to trim their fingernails and keep them rounded.

security who needs to be segregated. However, these alleged failings are, at most, allegations that these officials did not always comply with VDOC classification policies or apply those policies in the manner intended. State officials' failure to abide by state procedural regulations is not a federal due process issue and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax,* 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, I conclude that the defendants are entitled to judgment as a matter of law as to Smith's Claim (2), alleging due process violations during his classification under the Step-Down Program.

III. CONCLUSION.

For the reasons stated, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 26, is GRANTED.

A separate Judgment will be entered herewith.

ENTER: September 20, 2018

/s/ James P. Jones
United States District Judge